UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID GRIFFOR,

        Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for CF
BANCORP,

        Defendant.

                                   /

Case No. 10-12383

District Judge George Caram Steeh

Magistrate Judge R. Steven Whalen

**REPORT AND RECOMMENDATION**

      Before the Court are (1) a Motion for Summary Judgment filed by Defendant Federal Deposit Insurance Corporation ("FDIC")[Doc. #72], and (2) a Motion for Summary Judgment filed by Plaintiff David Griffor ("Griffor")[Doc. #74], which have been referred for Reports and Recommendations pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion [Doc. #72] be GRANTED, and that Plaintiff's Motion [Doc. #74] be DENIED.

**I.  FACTS**

      Plaintiff originally filed his complaint in the St. Clair County, Michigan Circuit Court, and Defendant FDIC removed the case to this Court on June 16, 2010. On April 11, 2011, Plaintiff filed a Second Amended Complaint [Doc. #39], and on April 25, 2011, the FDIC filed a counterclaim alleging breach of fiduciary duty, unjust enrichment, and negligence against Griffor [Doc. #40]. On October 3, 2011, attorney Alyson Oliver was substituted as Griffor's counsel, in place of Touma, Watson, Whaling, Coury and Castello, P.C. [Doc. #52]. On February 13, 2012, attorney Oliver moved to withdraw, citing a breakdown in the

attorney-client relationship [Doc. #66], and on March 1, 2012, the Court granted the motion, with attorney Oliver's withdrawal effective upon the completion of Griffor's deposition [Doc. #69]. Griffor is now proceeding *pro se*.

Griffor's Second Amended Complaint [Doc. #39] alleges claims of breach of contract-unpaid commissions (Count I), breach of contract-wrongful termination (Count II), breach of independent contractor agreement (Count IV), and breach of severance agreement (Count V).[1]

According to the Second Amended Complaint, Griffor was employed by Citizens First Bank ("CFB") in Port Huron, Michigan from June, 1997 to January 4, 2010. On April 30, 2010, CFB was closed by the Michigan Department of Financial and Insurance Regulation, and the FDIC was appointed receiver for CFB. Griffor states that in 2009, he was assigned "to help address the large quantities of defaulted loans and bank owned real estate ('REO')." *Second Amended Complaint*, ¶ 6. Part of his job was to find purchasers for the collateral of troubled loans, and CFB agreed to pay him commissions on sales of those assets. *Id*. ¶¶ 6-7. He claims that CFB refused to make payment, and is liable for double damages under Michigan's Wages and Fringe Benefits Act. *Id*. ¶¶ 10-11.

Griffor further alleges that his employment was wrongfully terminated in violation of "the implied agreement with the Defendant concerning his employment, Defendant's employee handbook, and the express authorization of Defendant for the programs instituted by Griffor." *Id*. ¶¶ 23-24.

---

[1] Griffor's claims of libel and slander [Count III] and misrepresentation [Count VI] were dismissed by stipulation on January 25, 2012 [Doc. #64].

Griffor alleges in Count IV that after his employment was terminated, he continued to work as an independent contractor, and is entitled to commissions on sales that he negotiated. *Id*. ¶¶ 37-44.

Finally, in Count V, Griffor claims that he was offered a severance payment apart from his claim for commissions. He claims that CFB wrongfully withdrew the severance agreement. *Id*. ¶¶ 46-52.

At his deposition, Griffor acknowledged that he was an at-will employee of CFB:

Q: Okay. We talked a little bit earlier about your at-will status with the bank. You understood that that meant that the company could terminate you for any reason or no reason at all?

A: Yes.

Q: And you, did you also understand, as of the time of your termination, that if the bank wasn't satisfied with your performance they could terminate you?

A: Yes. *Griffor Dep.*, 193-194. (Defendant's Sealed Exhibit 1).

\*                              \*                              \*

Q: Let me just return real quickly to, to this Exhibit 15. Your status as of that date, November 13 [2009] was as of an at-will employee. Was–were you still an at-will employee as of the January 4th termination date, to your knowledge, or was there something that changed that status, to your knowledge?

A: As far as I know, I was. *Id.,* 117.

Defendant has submitted as Sealed Exhibit 4 relevant portions of CFB's Employee Handbook, signed by Griffor, stating that his employment is at-will, that "nothing in this Manual operates to change the status of the Employee from 'at will' to any other status," and that "[a]ny representations that change the Employee status from an 'at will' status must be in writing and signed by the Chairman, President, and CEO of the organization. Any other proposed changes in the 'at will' nature of the employment arrangement are without any effect."

Griffor testified that after he was terminated, he continued to try to sell some properties to a group of investors. However, he testified that the deal did not close:

> Q: Okay. But there was never any–there was no closing on this deal? The deal did not close?
>
> A: We were waiting, no, we were waiting for the title work and everything else to come back and while that was happening the deal fell apart. *Id.*, 66.

Griffor further testified that any commissions depended on closing the sale:

> Q: And if the sale didn't go through, were you still going to get any kind of commission?
>
> A: No. *Griffor Dep.*, 60.

Griffor conceded that he had no written agreement with CFB for the payment of commissions. *Id.*, 62-63, 148-150.

Griffor testified that he and CFB were negotiating a severance agreement, but no agreement was signed by CFB. *Id.* 62-63, 113, 193. Rather, CFB withdrew severance offers. *Defendant's Sealed Exhibit* 3.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990). Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Entry of summary

judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

### III. DISCUSSION

#### A. FDIC's Motion [Doc. #72]

##### 1. Wrongful Termination

Griffor alleges that he was terminated in violation of an "implied" employment agreement. However, even if there were an unwritten, "implied" agreement, it would be without effect. The Employee Handbook (Defendant's Exhibit 4), signed by Griffor, clearly designates him as an at-will employee, and he conceded as much in his deposition. In addition, the Handbook requires that any change in at-will status must be in writing, signed by the Chairman, President and CEO of the organization. No such writing exists with respect

to Griffor. It is uncontested that at the time of his termination, he was an at-will employee.

Absent unlawful discrimination or other violation of federal law, there can be no claim for wrongful termination where the employment is at-will. *See Pratt v. Brown Mach. Co.*, 855 F.2d 1225 (6th Cir.1988). Moreover, express "at-will" language in an employee handbook is binding. *Dell v. Montgomery Ward and Co.*, 811 F.2d 970 (6th Cir. 1987). Given the express disclaimers of just-cause employment in the Handbook, and the clear language establishing an at-will employment relationship that could be altered only by the written agreement of corporate officers, Griffor's theory that there was an "implied" contract of just-cause employment must be rejected. *See Lytle v. Malady (On Rehearing)*, 458 Mich. 153, 165, 579 N.W.2d 906 (1998). *See also Rood v. General Dynamic Corp.*, 444 Mich. 107, 138-39, 507 N.W.2d 591 (1993).

Therefore, summary judgment should be granted to the FDIC on the wrongful termination claim.

### 2. Commissions, Severance and Other Compensation

Griffor's remaining claims are all premised on alleged agreements to pay him commissions and other compensation for work done both before and after his termination and for severance. However, none of these agreements is in writing. This is fatal to Griffor's claims against the FDIC.

12 U.S.C. § 1823(e) reads as follows:

No agreement which tends to diminish or defeat the interest of the Corporation [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement-

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

Section 1823(e) is a codification of the *D'Oench* doctrine, as articulated in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447 (1942), and its progeny. "Both § 1823(e) and the *D'Oench* common law doctrine are designed to further the same objective of protecting the federal banking regulatory authority from undocumented agreements that impede the regulatory authority's ability to perform its Congressionally mandated functions." *Federal Deposit Ins. Corp. v. McCullough*, 911 F.2d 593, 599, fn. 4 (11th Cir. 1990). The FDIC may assert the *D'Oench* doctrine as a defense to actions brought against it. *Hall v. Federal Deposit Insurance Corporation,* 920 F.2d 334, 340 (6th Cir.1990), *cert. denied,* 501 U.S. 1231(1991). Under the *D'Oench* doctrine, unwritten agreements with a predecessor bank are not enforceable against the FDIC "because such agreements, not appearing in the bank's records, would have a tendency to deceive the bank examiners as to the true value of the bank's assets even if an intent to deceive the examiners was not present." *Abrams v. FDIC*, 944 F.2d 307, 310 (6th Cir. 1991), *citing Langley v. FDIC,* 484 U.S. 86, 91-92 (1987).

The uncontradicted evidence in this case shows that (1) Griffor's alleged agreement for commissions during the term of his employment with CFB is not substantiated by a signed, written agreement; (2) Griffor's alleged agreement for commissions on sales of assets

after the termination of his employment was not reduced to writing;[2] (3) Griffor's claim in Count I for indemnification of legal costs was never agreed to in writing; (4) while Griffor and CFB engaged in negotiations for a severance agreement, no agreement was ever finalized, reduced to writing, and signed by CFB. *See Griffor Dep.*, 113, 193, 276-280;[3] (5) Griffor's alleged "implied" just-cause employment contract was never reduced to writing and signed by the parties. Given the complete absence of any written agreements to support these claims, the FDIC is entitled to summary judgment, and Griffor's claims must be dismissed.[4]

### B. Griffor's Motion [Doc. #74]

The FDIC's claims against Griffor center on his activities in 2009, in relation to the sale of bank-owned properties, and after Griffor, formerly a loan officer, was transferred to CFB's "special assets group." Griffor is alleged to have been involved in a series of transactions known as "package loans," where properties the CFB owned as a result of foreclosures were sold as part of a package that also included properties that were not bank owned. Some of these properties were owned by Griffor. It is alleged that as a result, Griffor operated under a conflict of interest, and realized significant personal profits, in violation of CFP policy. Griffor is also alleged to have made payments for his borrower customers, causing them to appear as better financial risks than they actually were. This created a

---

[2] In any event, Griffor testified that even under the oral understanding, he would not receive a commission unless the sale was consummated. Griffor clearly testified that the deal fell apart, and the sale did not go through. Thus, he would not be entitled to this commission even if the alleged oral agreement were enforceable.

[3] Because CFB withdrew its offer of severance, and its corporate officers never signed an agreement, there was no "meeting of the minds," and hence no enforceable contract. *See Board of Control v. Burgess*, 45 Mich.App. 183, 206 N.W.2d 256 (1973).

[4] Griffor does not address the impact of the *D'Oench* doctrine in either his response to the FDIC's motion [Doc. #82] or in his own summary judgment motion [Doc. #74], nor has he submitted any written contract as to severance or any other alleged agreement.

conflict of interest between himself and the bank, and violated both established banking practices and CFB's own policies.

In his motion, Griffor contends that he had no lending authority, "[t]hus making the FDIC's claim that I acted recklessly in approving high risk loans completely untrue." *Griffor's Motion* [Doc. #74], ¶ 1. He further states that any activities with regard to the package loans were fully disclosed to his superiors, and were done with their approval. *Id.* ¶ 2.

The FDIC has submitted a number of exhibits, including depositions and affidavits, with its response [Doc. #83]. Sealed Exhibit 1 is Griffor's deposition transcript. Griffor acknowledges that he owed CFB a fiduciary duty, and that he was bound by CFB's policies. *Griffor Dep.*, 199, 141-143, 194-199. Griffor conceded that in negotiating the package loans, he would acquire properties in his own name or in the name of one of his investment companies from H.U.D. at a relatively low price, combine them with bank owned properties, and sell the package at a significant mark-up, generating a substantial profit for himself, sometimes double what he paid for the property when he purchased it. *Id.* 199-205. He acknowledged that in such case, the bank would have to lend a greater amount to the buyer than if the property were sold at the price Griffor paid for it. *Id.* 201-202.

The FDIC has also submitted as Exhibit 4 the affidavit of attorney David C. Devendorf, who acted as legal counsel to the bank. He states that he drafted the Code of Business Conduct (the "Code") that was adopted by the Board of Directors in 2008, and disseminated to all employees. *Davendorf Affidavit*, ¶¶ 3-5.[5] He states that the Code prohibits employees from engaging in activities that constitute or may appear to constitute a conflict of interest; prohibits employees from using corporate information or property for personal

---

[5] A copy of the Code is appended to Mr. Davendorf's affidavit.

gain; and prohibits employees from having a financial interest in a borrowing customer. *Id.* ¶¶ 7-9. He further states that to the best of his knowledge, neither the Audit Committee nor the Board of Directors granted Griffor a waiver of the Code. *Id.* ¶ 11.

The FDIC's Exhibit 5 is the affidavit of Patrick M. McQueen, which contains his expert opinions regarding the propriety of Griffor's conduct. Mr. McQueen states as follows concerning his qualifications:

> "I have over 40 years experience in banking and bank regulations, having been a senior officer of a large regional bank, president and C.E.O. of a community bank and president and C.E.O. of the Michigan affiliate of an Illinois based regional bank. I also served as the Commissioner of the Michigan Financial Institutions Bureau for seven years, as the primary bank and credit union regulator in Michigan. I have served on the board of directors of three banks and am considered an expert on banking, bank governance and bank regulation." *McQueen Affidavit*, ¶ 2.

After describing State and Federal banking laws and regulations, common law requirements and generally accepted banking practices, as well as CFB's policies, Mr. McQueen opines as follows: (1) Griffor's conflict of interest became egregious when he increased his own profits at the bank's expense, specifically when he "inflated the sales price of the parcels he added to the packages at the same time causing the loan size, the risk to the Bank, to rise;" (2) Griffor breached his fiduciary obligations to the bank and had serious conflicts of interest; (3) under the Michigan Banking Code standard, Griffor did not by his actions act as an ordinarily prudent person; (4) by failing to avoid a conflict of interest, Griffor violated the Code; (5) Griffor violated that portion of the Code that prohibits employees from having a financial interest in customers of the bank, as well as the Code's conflict of interest policy; (6) contrary to the conflict of interest policy, Griffor personally profited by not conducting the sale of the bank owned properties at "arm's length;" (7) there is no indication that the Board approved of any of Griffor's activities, and "Griffor's assertions that others (Doug Brandewie and/or David Spielberg and/or Marsh Campbell)

-10-

were aware of these transactions are immaterial; none of these individuals were permitted to waive these policies;" (8) "Griffor's subject activities were inherently unsafe and unsound, violations of accepted standards, actual conflicts of interest and/or gave the appearance of conflicts. These raised the risk profile of the Bank and (were) a potential source of damage to the Bank's reputation;" (9) "Griffor's loan payments on behalf of borrowers violated bank policies, F.D.I.C. regulations, the Michigan Banking Code, and the fiduciary duty owed by Griffor to CF Bancorp;" (10) Griffor's handling of the Joseph Martindale transaction involved a conflict of interest and if the assertions are true, would constitute a breach of Griffor's fiduciary duties."[6] *Id.* 9-14. In summary, Mr. McQueen states as follows, at p. 14 of his affidavit:

> "Griffor's conduct is not that which an ordinarily prudent person would consider reasonable. Griffor engaged in conflicts of interest and/or actions which gave the appearance of a conflict of interest. Griffor acted contrary to established bank policy, which could not be waived except by the Board of Directors or Audit Committee. Griffor's conduct constituted unsafe and unsound banking practices, raised the risk profile of the Bank and likely harmed its reputation. In my opinion, based on years as a banker, bank regulator and industry leader, I have rarely seen such a flagrant and egregious conflict of interest."

FDIC Exhibit 6 is the affidavit of Daniel G. Lockwood, former chair of the Audit Committee of CF Bancorp. He states that in 2009, the Audit Committee learned that Griffor realized profits from his role in the package loans, "despite the fact that personal profits by employees were prohibited by CF Bancorp's policies." *Lockwood Affidavit*, ¶ 4. Mr. Lockwood states that the Audit Committee never approve Griffor to realize personal profits while he was an employee, and did not waive any of the Bank's rules or policies against making personal profits. *Id.* ¶ 11. He further states that the Audit Committee never approved the making of loan payments by Bank employees on behalf of borrowers, and that "[t]he

---

[6] Joseph Martindale's affidavit is contained in FDIC Exhibit 7.

making of loan payments for borrowers by Citizens First employees was not an accepted practice, and would have been considered by the Audit Committee to create potential conflicts of interest and to create the appearance of impropriety." *Id.* ¶¶ 12-13.

Griffor has admitted to most if not all of the acts that he is alleged to have committed with regard to the package loans. His defense appears to be that he did not conceal these activities, that the activities were approved by his superiors, and that he actually helped the Bank by having bank owned properties sold. Given Griffor's admissions in his deposition, along with the affidavits discussed above, the FDIC has clearly presented sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, *supra*. Accordingly, Griffor's motion for summary judgment on the FDIC's counter-claims must be denied.

## IV.  CONCLUSION

For these reasons, I recommend that Defendant FDIC's Motion for Summary Judgment [Doc. #72] be GRANTED, and that Plaintiff David Griffor's Motion for Summary Judgment [Doc. #74] be DENIED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v.*

*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

**s/ R. Steven Whalen**
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: February 28, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail disclosed on the Notice of Electronic Filing on February 28, 2013.

David Griffor
2626 Military St
Port Huron, MI 48060-8136

Johnetta M. Curry-Williams
Case Manager